IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WEST, Corporation, A Delaware Corporation, ) ) ) | |
| Plaintiff, ) ) ) | CASE NO. 8:05CV88 |
| v. ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| AT&T CORPORATION, ) ) ) | |
| Defendant. ) | |

This matter came on for trial to the Court on January 16–17, 2007. Pursuant to my findings of fact and conclusions of law stated below, I find that the Plaintiff West Corporation ("West") did not meet its burden of showing that the Administrative Expense Fee ("AEF") it paid to AT&T Corporation ("AT&T") for April 2003 was "unrelated" to the Universal Service Fund ("USF"), and that the Defendant and Counter-claimant AT&T did meet its burden of demonstrating that the AEF it charged to West in subsequent months *was* related to the USF. Consequently, judgment will be entered in favor of AT&T on both West's initial claim and AT&T's counter-claim.

**Findings of Fact**

1.  West is a Delaware corporation with its principal place of business in Nebraska. (Order on Pretrial Conference (Uncontroverted Facts), Filing No. 100, p. 2 ¶ 3).

2.  InterCall, Inc. ("InterCall"), is a subsidiary of West, acquired prior to November 2003. (Tr. 118:2–6; Ex. 6).

3.  AT&T is a New York corporation with its principal place of business in New Jersey. (Filing No. 100, p. 2 ¶ 1).

4.  AT&T is regulated by the Federal Communications Commission ("FCC"). (Filing No.

100, p. 2 ¶ 2).

5. As a regulated interstate telecommunications carrier, AT&T is required to contribute to the USF.  (Trial Transcript, "Tr.," at 146:14–15).

6. The USF is administered by the FCC to ensure affordable telecommunication services to rural and low-income areas, schools, and hospitals. (47 C.F.R. §§ 54.706, 54.709(a)).

7. On October 6, 2000, West and AT&T entered into a "Master Agreement," whereby AT&T agreed to provide, and West agreed to pay for, telecommunication services, *i.e.*, voice and data services.  (Filing No. 100, p. 2 ¶ 4).

8. At the time of trial, West paid AT&T approximately $50 million annually for the services West received from AT&T.  (Tr. 13:16–20).

9. At the time of trial, West also purchased telecommunication services from carriers other than AT&T.  (Tr. 70:25 to 71:3).

10. The Master Agreement stated: "You [West] shall pay AT&T for Your and Users'[1] use of the Services at the rates and charges specified in the Attachment, without deduction, setoff or delay for any reason except for amounts disputed in good faith." (Ex. 1, § 2.1); "In the event of a conflict between the General Terms and Conditions and any Attachment, the Attachment shall take precedence."  (Ex. 1, p.1); and "State law issues concerning construction, interpretation, and performance of this Agreement shall be governed by the substantive law of the State of New York, excluding its choice of law rules."  (Ex. 1, § 12.6).

---

[1]"User" means anyone who uses or accesses any service purchased by West under the Master Agreement.  (Ex. 1, § 1.3).

11. On March 7, 2002, West executed a service attachment with AT&T that was incorporated into the Master Agreement. (Ex. 4). On April 18, 2003, West executed a service attachment with AT&T that was incorporated into the Master Agreement. (Ex. 2). On November 25, 2003, InterCall executed a service attachment with AT&T that was incorporated into the Master Agreement. (Ex. 6). On January 11, 2005, West executed a service attachment with AT&T that was incorporated into the Master Agreement. (Ex. 3). On February 21, 2005, InterCall executed a service attachment with AT&T that was incorporated into the Master Agreement. (Ex. 8).

12. Each service attachment contained the following provision: ". . . AT&T reserves the right to increase charges as a result of expenses incurred by AT&T relating to regulatory assessments stemming from an order, rule or regulation of the Federal Communications Commission or other regulatory authority or court having competent jurisdiction (including but not limited to . . . USF related expenses)." (Exs. 4, 2, 6, 3, 8).

13. The service attachments stated that AT&T would provide services or offers for services to West under those service attachments pursuant to AT&T's Service Guide, located at http://www.att.com/serviceguide/business or such other designated location, as amended from time to time. (Ex. 4, p. 3 § 1; Ex. 2, p. 2 § 1; Ex. 6, p. 2 § 1.1–1.2; Ex. 3, p. 3 § 1.1–1.2; Ex. 8, p. 3 § 1.1–1.2).

14. Prior to April 1, 2003, AT&T assessed a Universal Connectivity Charge ("UCC"), comprised of USF contributions plus other surcharges, including USF-related expenses. (Tr. 146:19 to 148:16).

15. The Service Guide contained a section identified as "General Terms and

Conditions," including a sub-section for "Payments and Charges." The UCC that was charged by AT&T was found under "Additional Monthly Charges." (Ex. 104, p. 1).

16. Prior to April 1, 2003, the UCC clause in the Service Guide provided in relevant part that "[s]ervices provided pursuant to this Service Guide . . . are subject to an undiscountable monthly Universal Connectivity Charge." (Ex. 104, p. 1). Version 14 of the Service Guide, in effect between February 1, 2003 and April 1, 2003, stated that the UCC "is 9.60% of the Customer's total net interstate and international charges." (Ex. 104, p. 1).

17. The pre-April 1, 2003, UCC monthly charge and corresponding rate was addressed only in the Service Guide, and was not modified by the Master Agreement or the service attachments. (Tr. 55:5 to 56:16; Tr. 57:22 to 58:18).

18. The UCC rate charged prior to April 1, 2003, included several factors. The primary factor was the USF contribution rate charged by the FCC to AT&T on the net sales revenue received from customers like West. Another factor incorporated in the UCC rate was a surcharge that included a percentage for that portion of UCC charges that AT&T estimated it would be unable to collect from its non-exempt customers. The final factor was a surcharge or mark-up for AT&T's estimated USF-related administrative expenses. (Tr. 147:12 to 148:14).

19. West paid the UCC charges imposed by AT&T prior to April 1, 2003. (Tr. 24:13 to 25:7).

20. On December 13, 2002, the FCC issued an order, *In re Federal-State Joint Board on Universal Service*, 17 F.C.C.R. 24,952 (2002) ("FCC Order"), which, among other

things, modified various procedures relating to telecommunications carriers and their recovery of USF assessments and associated administrative expenses from customers. Those changes became effective April 1, 2003. (Ex. 12).

21. On March 4, 2003, AT&T sent a notice to West stating that, consistent with the FCC Order, AT&T would change its billing practice effective April 1, 2003. (Ex. 9). The notice stated that effective April 1, 2003, AT&T's UCC charge, which previously was used to collect the USF and other mark-ups, including administrative expenses, would match the FCC's USF contribution factor. (Ex. 9). AT&T's administrative expenses related to its USF contribution factor would be charged and billed as a separate line item labeled AEF. (Ex. 9).

22. AT&T sent a follow-up notice to West on March 27, 2003, further explaining the change in AT&T's monthly billing statements. (Ex. 10).

23. Effective April 1, 2003, AT&T recovered its administrative expenses related to its USF contribution obligation through a separate AEF. Although AT&T had recovered a portion of its administrative expenses related to USF as part of the monthly UCC charge prior to April 1, 2003, AT&T modified its cost accounting approach for identifying and estimating its USF-related expenses as of April 1, 2003. (Tr. 149:3 to 151:18). AT&T's modified approach, to identify USF-related expenses and calculate its AEF cost recovery rate to recover those expenses from customers, was created by a team of employees led by Kristina Rodriguez, AT&T's regulatory assurance manager as of April 1, 2003. (Tr. 144:8–24; Tr. 150:24 to 152:12).

24. AT&T identified eight primary administrative expenses, or cost categories of administrative expenses, that it used to calculate its USF contribution obligation.

5

(Tr. 153:11–18; *see also* Exs. 16–18).   The eight cost categories were as follows: (1) Bill Print; (2) Collections & Dispute Management; (3) Billing Platform & Maintenance; (4) System Development UCC Change; (5) Bill Media; (6) Customer Care; (7) Sales & Sales Support; and (8) Other SG&A.  (Tr. 153:11–18; *see also* Exs. 16–18).

25. For each of the eight categories of administrative expenses, AT&T identified specific cost drivers that enabled it to estimate that portion of the cost category that was related to its USF contribution obligation.  (Tr. 153:11 to 155:10).

26. Regarding the "Bill Print" category, AT&T calculated its internal cost of printing a single line of text on a customer bill.  AT&T then analyzed a sampling of bills of customers of different sizes and determined the number of line items that appeared each month related to UCC charges.  (Tr. 155:11 to 157:19).  AT&T also estimated the number of lines appearing on a customer bill that contained special messages related to UCC.  Using the estimated number of lines, multiplied by the number of bills that were sent each month and AT&T's internal cost for each line of print appearing on a customer bill, AT&T calculated that portion of its estimated Bill Print expense that was related to its USF contribution obligation.  (Tr. 155:11 to 157:19).

27. Regarding the "Collections & Dispute Management" category, AT&T considered all the various functions, or components, of the administrative expenses falling within this expense category, and removed the expenses associated with those functions that, according to AT&T, were not related to USF.  (Tr. 158:4 to 159:7).  AT&T then determined that approximately 8.8% of the money the Collection and Dispute Management function was designed to recover was related to UCC.  Accordingly,

       AT&T estimated that 8.8% of the "net" expenses related to the Collection and Dispute Management function was related to USF. (Tr. 158:4 to 159:7; *see also* Exs. 16–18).

28. Regarding the "Billing Platform & Maintenance" category, AT&T used IBM to manage its computer systems to support its customer billing platforms. (Tr. 160:2–5). The computer systems were programmed to identify customer revenue that was subject to a UCC charge, and then calculated the UCC charge that appeared on a customer bill. (Tr. 160:6 to 161:18). Each customer bill differed based on the type of services purchased by the customer, and the services that were subject to UCC charges. Based on information provided by IBM, AT&T determined that two of the sixteen billing platforms were for UCC-related billing functions. Accordingly, AT&T multiplied the total Billing Platform Maintenance expenses multiplying 12.5% (2/16) to estimate the total portion of that expense category that was related to USF. (Tr. 160:6 to 161:18).

29. The "System Development UCC Change" category was a one-time direct expense related to IBM's charges for modifying AT&T's billing systems to calculate and bill UCC charges separate from AEF charges. (Tr. 161:19 to 162:18).

30. The "Bill Media" category represented the expenses AT&T incurred in sending USF or UCC-related messages to its customers on a quarterly basis. (Tr. 162:19 to 163:15). Using information provided by IBM, the contractor that developed the messages on AT&T's customer bills, AT&T estimated the expense charged by IBM to develop the quarterly messages appearing on the customer bills. (Tr. 162:19 to 163:15).

31. The "Customer Care" category was expenses related to resources employed by AT&T to respond to customer inquiries about their bills. (Tr. 163:16–19). To determine what portion of that expense was related in some manner to AT&T's USF contribution obligation, AT&T asked its quality analysts who supervise the interaction between customers and AT&T's customer care representatives, to estimate what percentage of time the representatives spent addressing USF/UCC issues. (Tr. 163:20 to 165:3). Based on the sampling, AT&T estimated that its customer care representatives spent approximately 1% of their time addressing USF/UCC related issues with customers. (Tr. 164:16–22). AT&T then multiplied the total expenses allocated to Customer Care by 1% to estimate the portion that was related to AT&T's USF contribution obligation.

32. The "Sales & Sales Support" category took into consideration the fact that AT&T's sales and sales support representatives spent some of their time during the pre-sale and post-sale process explaining rates to customers, including USF/UCC charges. (Tr. 165:4–15). Those representatives were also involved to some extent in change orders and customer disputes. (Tr. 165:4–15). AT&T determined that some portion of its Sales and Sales Support category of expenses was related to USF/UCC charges and issues. AT&T conducted a survey of its sales managers to estimate what portion of a sales representative's time was spent addressing USF/UCC related issues. (Tr. 165:17 to 167:23). Using the responses from the sales managers, AT&T prepared a weighted average of the responses submitted by its sales managers based on the size of their respective sales departments. Using a weighted average, AT&T estimated that its sales and sales support personnel spent

approximately 2.86% of their time addressing USF/UCC related issues. Therefore, AT&T multiplied the expenses charged to Sales and Sales Support by 2.86% to calculate the estimated portion of that expense category related to USF/UCC. (Tr. 165:17 to 167:23).

33. The final cost category was "Other SG&A-HQ." Rodriquez and her team developed a list of the names of managers within AT&T's headquarters that dealt in some manner with UFF/UCC related issues. Those managers included attorneys, product mangers, marketing managers and headquarters. All those identified on the list were required to estimate what portion of their time was spent dealing with USF/UCC related issues. (Ex. 25). AT&T then multiplied the percentages supplied by each manager by his or her direct salary to determine the estimated portion of SG&A-HQ that was related in some manner to AT&T's USF contribution obligation. (Ex. 25).

34. Using the total of the eight cost categories, AT&T divided that number by the total estimated assessable revenue for 2003 to calculate the AEF cost recovery rate. (Tr. 169:23 to 171:14). "Assessable revenue" refers to that customer revenue which is subject to the FCC's USF charges. Thus, the AEF charges were applied to the same customer revenue that is assessed USF/UCC. (Tr. 169:23 to 171:14).

35. In 2004, AT&T used the same expense recovery model to calculate its AEF cost recovery rate. (Tr. 172:7 to 177:7). The estimated expenses changed in 2004 based on changes in estimated total expenses for the categories, and changes in the responses AT&T received from the various department heads.

36. For 2005, AT&T did not conduct the same level of analysis of the expenses

categories comprising its AEF cost recovery rate. (Tr. 177:8 to 179:21).

37. Version 15 of the Business Service Guide, effective April 1, 2003, contained a section identified as "General Terms and Conditions," which included a sub-section for "Payments and Charges." (Ex. 105). The AEF was listed under "Additional Monthly Charges," and provided in relevant part that "[s]ervices provided pursuant to this Service Guide are subject to an undiscountable monthly Administrative Expense Fee." (Ex. 105).

38. Version 15 of the Business Service Guide set forth an AEF rate of 0.74% effective April 1, 2003. (Ex. 105).

39. The monthly UCC rate and AEF rate were set forth only in the Service Guide. Neither rate was specifically addressed or modified in the Master Agreement or any service attachments. (Exs. 1–8).

40. On April 1, 2003, AT&T began charging West an AEF at the rate of 0.74% of assessable revenues as a line item separate from the UCC. (Tr. 24:5–19).

41. The AEF was increased to 0.88% of assessable revenues in version 30 of the Service Guide as of April 1, 2004. (Ex. 106, p. 1).

42. The AEF remained at 0.88% of assessable revenues as of the time of trial, and remaining unchanged since April 1, 2004. (Ex. 7, p. 1; Tr. 61:11–21).

43. From and after April 1, 2003, AT&T provided voice and data services to West pursuant to the Master Agreement, the various service attachments, and the Service Guide. (Tr. 55:5 to 56:16).

44. Since April 1, 2003, West has attempted to negotiate a lower AEF rate than what was reported in the Service Guide each time the parties discussed a new service

attachment.  (Tr. 95:16 to 97:18; *see also* Tr. 56:22 to 58:18).  Each time West made such a request, AT&T advised West that the AEF rate could not be changed. (Tr. 95:16 to 97:18; *see also* Tr. 56:22 to 58:18).  Despite West's lack of success in its attempt to negotiate a lower AEF rate, West continued to enter into new service agreements with AT&T.

45. West paid AT&T's AEF charges in April 2003 in the amount of $10,002.83.  (Tr. 74:21–25).

46. West has withheld payment of any AEF charges since April 2003.  (Tr. 24:5–22).

47. After a May 5, 2003, letter was sent by West to AT&T disputing the AEF charges, the parties agreed that although AT&T would continue to charge West AEF, the monthly charges were placed in a "dispute process" until the basis for West's objections were resolved.  (Tr. 128:11 to 129:25).  The Master Agreement stated that "in the event of a bona fide dispute over a charge specifically identified by [West] through written notice to AT&T, payment of the identified charge will not be considered past due and no interest will be charged for non-payment of such disputed charges."  (Ex. 1, p. 2 § 2.3).

48. From and after May 1, 2003, through December 31, 2006, AT&T billed West for AEF charges totaling $1,209,050.40 under the Master Agreement and the service attachments thereto. (Filing No. 100, p. 3 ¶ 12; *see also* Tr. 15:4–12; 47:13 to 48:7).

49. West does not dispute that AT&T accurately calculated the monthly AEF charges billed to West consistent with the prevailing AEF rates published in the Service Guide.  (Tr. 49:4–17).

50. AT&T does not track administrative expenses incurred in recovering USF charges

on a customer-by-customer basis. (Tr. 176:1–22). Rather, AT&T identifies administrative expenses, which in AT&T's judgment, are related in some manner to the recovery of UCC charges from its non-exempt customers. AT&T then recovers those expenses through its AEF cost recovery rate. The same AEF rate is charged to AT&T's non-exempt customers against the revenues for which the customer is assessed the UCC. (Ex. 16–18; Tr. 150:12 to 153:15; Tr. 169:23 to 171:21).

51. The AEF charges appearing on the non-exempt customer's monthly bills are calculated by multiplying the then-current AEF rate by the non-exempt customer's monthly charges for usage of those telecommunications services that are subject to the FCC's USF. (Tr. 170:15 to 171:8).

52. The industry standard is assessment of AEF to all customers in terms of a percentage of assessable revenues. This practice is also consistent with standard cost accounting principles and practices. (Tr. 276:18 to 277:15).

**Conclusions of Law**

1. There is complete diversity between the parties, and the amount in controversy exceeds $75,000. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. This Court has jurisdiction over both West's unjust enrichment claim (or, as this Court has previously noted, West's claim may be viewed as a breach-of-contract claim (*see* Filing No. 96)), and over AT&T's breach-of-contract counter-claim, as these claims allege, respectively, that the AEF charged by AT&T is *unrelated* or *related* to the USF. This Court is without primary jurisdiction over any

allegation that rates charged by AT&T are *unreasonable* or *unfair*.

2. Because this matter is before the Court on diversity jurisdiction, the Court will apply the substantive law of the forum. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Nebraska follows the Restatement (Second) of Conflicts § 188. *Johnson v. U.S. Fid. and Guar. Co.*, 696 N.W.2d 431 (Neb. 2005). When a contract contains a choice of law provision, § 188 directs the Court to follow § 187.[2] The Master Agreement between AT&T and West states that the substantive laws of New York apply "to any state law issues concerning construction, interpretation and performance." (Ex. 1, ¶ 12.6). In the absence of a violation of a fundamental state policy, Nebraska courts generally defer to the parties' choice of law provision. *Vanice v. Oehm*, 526 N.W.2d 648, 651 (Neb. 1995). Therefore, because no violation of a fundamental Nebraska state policy is alleged, the Court will apply New York law to substantive matters.

3. This Court granted partial summary judgment in favor of AT&T. (*See* Filing No. 65). This Court later clarified that only two issues remained for trial: (i) whether AT&T

---

[2]Restatement (Second) of Conflicts § 187 states in pertinent part:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

  (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

  (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

charged and West paid, in April 2003, an AEF that included amounts *unrelated* to USF; and (ii) whether West failed to pay, from May 2003 to the present, an AEF *related* to USF. (Filing No. 96).

4. Applying New York law, West bears the burden of proving that the AEF it paid to AT&T in April 2003 was unrelated to USF, and AT&T bears the burden of proving that the balance of the AEF it wishes to collect from West is related to USF. *See Manshul Const. Corp. v. Dormitory Auth.*, 79 A.D.2d 383, 387 (N.Y.A.D. 1981) ("As in all contract actions, the burden of proving the damages is on plaintiff.").

5. AT&T can collect AEF pursuant to the FCC Order. (*See* Filing No. 65). *See also Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 425 (4th Cir. 2004) ("The FCC permits telecommunications carriers . . . to recover the costs of their contributions to the USF from their customers, either through increased rates or through a separate line item on the customers' bills.").

6. This Court previously ruled that AT&T can collect AEF from West, pursuant to the Master Agreement, service attachments, and the Service Guide. (*See* Filing No. 65).

7. The Master Agreement, service attachments, and the Service Guide, limit AT&T to charging AEF that is specifically "related" to USF. This concept of "relatedness," as contemplated by the Master Agreement, service attachments, and Service Guide, is a contractual standard to which the parties have obligated themselves, and is independent of and distinct from what the FCC might determine to be fair and reasonable.

8. To the extent that West wishes to challenge the fairness and reasonableness of the AEF in light of the December 2002 FCC Order, this Court previously found that issue to be a matter within the province of the FCC. (Filing No. 65). *See* 47 U.S.C. § 201(b); *Access Telecomms. v. Southwestern Bell Tel. Co.*, 137 F.3d 605, 609 (8th Cir. 1998) (stating "Congress granted to the FCC the authority to determine whether '[a]ll charges, practices, classifications, and regulations' are reasonable"). [3]

9. AT&T demonstrated by a preponderance of the evidence that the AEF charges it assessed to West were related to USF, and West did not demonstrate by a preponderance of the evidence that such charges were unrelated to USF. I reject West's argument that any AEF charged by AT&T to West must relate only to the *collection* of USF, or that the AEF must relate only to the collection of USF specifically from *West*. Accordingly, I find that from and after April 1, 2003, AT&T billed West for voice and data services in a manner consistent with the terms of the

---

[3] 47 U.S.C. § 201(b) states:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

Master Agreement, the service attachments, and the Service Guide.[4]

10. The parties stipulated that the amount of unpaid AEF is $1,209,050.40, and that is the appropriate damage amount in AT&T's counter-claim against West.

## Disposition

IT IS ORDERED: Based upon foregoing Findings of Fact and Conclusions of Law, this Court finds that:

1. West has no claim for unjust enrichment and that claim is dismissed;

2. West has breached its contract with AT&T by failing to pay monthly AEF charges for the period of May 1, 2003, through December 31, 2006;

3. AT&T has established damages resulting from West's breach of the parties' contract in the amount of $1,209,050.40;

4. West must pay the outstanding AEF owed to AT&T in the amount of $1,209,050.40;

5. West must pay post-judgment interest at 5.05 per cent per annum; and

6. A separate judgment in favor of AT&T will be entered.

DATED this 26th day of February, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

---

[4]West's argument suggesting that the methodology used by Rodriquez in conducting surveys to allocate certain percentages of employee time to USF may have resulted in an overstatement of the percentages is well taken. However, without an expert of their own, simply criticizing AT&T's methodology does not tip the scale in West's favor.
  I do not find that the AEF charged by AT&T was necessarily fair, reasonable, or "legitimate," as may be required by FCC regulations. That is for the FCC to decide, if West challenges the charges administratively.